# Illinois Official Reports

## Appellate Court

---

### *Mims v. Paintsil*, 2021 IL App (1st) 191285

---

| | |
|---|---|
| Appellate Court Caption | MARY A. MIMS, Individually and as Independent Administrator of the Estate of Letasha Mims, Deceased, Plaintiff-Appellant, v. EMMANUEL PAINTSIL, M.D., Defendant-Appellee. |
| District & No. | First District, Second Division<br>No. 1-19-1285 |
| Filed | March 23, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2014-L-11878; the Hon. Thomas V. Lyons II, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Stephan Blandin, Michael Grieco, and Sarah E. King, of Romanucci & Blandin LLC, of Chicago, for appellant.<br><br>Joshua G. Vincent, Diane E. Webster, and James M. Lydon, of Hinshaw & Culbertson LLP, of Chicago, for appellee. |
| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1　　At a young age, Letasha Mims, now deceased, had been admitted to multiple nursing homes and hospitals with an incurable, fatal neurodegenerative disease that left her nonverbal, incontinent, and wheelchair bound, among other things. Letasha, like many incontinent nursing home patients, also suffered from chronic urinary tract infections and pressure sores. As Letasha's disease progressed, however, her physical health significantly declined. Letasha died on August 22, 2014.

¶ 2　　Letasha's mother, Mary Mims (plaintiff), individually and as independent administrator of her daughter's estate, filed a negligence action against one of Letasha's treating physicians, Dr. Emmanuel Paintsil (defendant), asserting claims under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2014)) and the Survival Act (755 ILCS 5/27-6 (West 2014)). Plaintiff alleged, in the main, that Letasha was abused and neglected at her last nursing home, which defendant failed to report, causing Letasha to experience pain and suffering until her death.

¶ 3　　The case ultimately was tried twice because the first trial resulted in a hung jury.[1] Defendant prevailed in the second trial. The trial court subsequently denied plaintiff's requests for a judgment notwithstanding the jury's verdict of no liability and for a third trial, then entered judgment in favor of defendant.

¶ 4　　Plaintiff now appeals, contending that the trial court erroneously denied her request for a new trial because the jury's verdict was against the manifest weight of the evidence, which she claims showed that Letasha was abused and neglected while she was under defendant's care.

¶ 5　　We note, however, that plaintiff does not challenge the trial court's decision denying her request for a judgment notwithstanding the jury's verdict. Additionally, she only challenges the jury's verdict as it relates to her survival claim.

¶ 6　　For the reasons that follow, we affirm.

¶ 7　　　　　　　　　　　　I. BACKGROUND
¶ 8　　　　　　　　　A. Letasha's Initial Hospital Admission
¶ 9　　The following pertinent evidence was adduced at trial.

¶ 10　　In 2002, Letasha, then 24 years old, was admitted to Jackson Park Hospital (Jackson Park) located in the south side of Chicago, with psychotic symptoms. She originally was diagnosed with schizoaffective disorder and depression.

¶ 11　　Plaintiff, a registered nurse, testified that a couple years before Letasha was admitted to Jackson Park, she began exhibiting bizarre behavior, resembling a "psychotic break." Thereafter, Letasha needed constant supervision. She was a flight risk and had to be chemically restrained "[u]ntil she died almost." Consequently, Letasha never returned home.

¶ 12　　Over the next 12 years, Letasha was admitted to six different nursing homes and five different hospitals, all located in Chicago. For the sake of brevity, however, we will mention only the facilities that are relevant to determining the sole issue on appeal, *i.e.*, whether the jury's verdict for defendant was against the manifest weight of the evidence.

---

[1]On June 20, 2018, the trial court entered an order declaring a mistrial after it found that the jury was unable to reach a verdict in the parties' first trial.

## B. Letasha's Fifth Nursing Home

In 2011, Letasha was at her fifth nursing home, All Faith Pavilion Nursing Home (All Faith), when she began suffering from severe cognitive decline, including her ability to speak and to walk, both of which she eventually lost. Letasha's treating physician at that time, Dr. Roop Gupta, diagnosed her with severe cognitive dysfunction, seizure disorder, and schizophrenia.

We note, however, that Dr. Gupta did not testify at trial and that the parties failed to include in the appellate record the official documentation containing his diagnosis, which was admitted at trial, even though they rely on it in their briefs. Illinois Supreme Court Rule 321 (eff. Feb. 1, 1994) provides, in relevant part, that "[t]he record on appeal shall consist of *** the entire original common law record," including "any documentary exhibits offered and filed by any party." Fortunately for the parties, the witness testimony in this case established that Dr. Gupta's diagnosis was found in Letasha's All Faith medical records, a fact the parties have not disputed on appeal.

Plaintiff eventually became dissatisfied with Dr. Gupta's treatment of Letasha and asked defendant, who she knew from work, to treat Letasha instead.[2] He agreed.

## C. Letasha Is Under Defendant's Care

In January 2012, defendant began treating Letasha at All Faith. At that time, however, Letasha was already in an advanced stage of cognitive decline. Specifically, she was completely immobile and incontinent of bowel and bladder, or doubly incontinent. Letasha also had difficulty eating and swallowing due to her uncontrollable muscle contractures and bruxism, a condition which causes unconscious grinding or clenching of the teeth, that she was diagnosed with before defendant took over her care.

## D. Letasha's Sixth Nursing Home

A few months later, Letasha was admitted to Alden Wentworth Rehabilitation and Healthcare Center (Alden) with, among other things, cognitive impairment secondary to anoxic encephalopathy, known generally as brain disease. Defendant continued to treat Letasha, seeing her once a week, even though he was only required to see her once every two months.[3] But as Letasha's brain disease progressed, her physical health only worsened. Particularly, Letasha suffered from an outbreak of rashes, stemming from the herpes simplex virus (herpes), which she was diagnosed with well before defendant began treating her.[4] Letasha also often developed pressure sores and urinary tract infections due, primarily, to her immobility and double incontinence. To make matters worse, Letasha was unable to communicate and frequently tried to remove her diapers and wound care dressings. Consequently, Alden's nursing staff sometimes found Letasha wearing soiled diapers or lying in feces with her

---

[2]Plaintiff met defendant when she was the Director of Nursing at Renaissance Nursing Home in Chicago.

[3]Both parties' experts agreed at trial that a physician who treats a patient in a nursing home is only required to see the patient once every 60 days.

[4]The record indicates that Letasha was diagnosed with herpes in August 2010.

wounds exposed. And on several occasions, Letasha, who repeatedly tried to get out of her wheelchair, fell before Alden's nursing staff could reach her, resulting in some minor injuries.

¶ 21　　Plaintiff claimed the foregoing showed that Letasha was abused and neglected at Alden, which somehow proved that defendant was negligent in treating her. Yet, defendant successfully treated Letasha's herpes outbreak and all but one of her pressure sores. He also ordered urine culture and sensitivity tests for Letasha, along with her routine pregnancy tests, to identify the bacteria that was causing her recurrent urinary tract infections. At some point, defendant observed that Letasha had unexplained weight loss, known as hypermetabolism, and ordered a thyroid test for her. He even scheduled a dentist appointment for Letasha to determine if dental problems were causing her unexplained weight loss.[5] Unfortunately, they were not.

¶ 22　　Defendant presented Dr. James Young, who is board certified in neurology, rehabilitative medicine, and electrodiagnostic medicine, as an expert witness. Dr. Young testified that Letasha's medical history revealed that she was suffering from a "progressive, *** destructive, *** incurable, and *** fatal" neurodegenerative disease. Specifically, Letasha's initial psychiatric symptoms, as well as her hypermetabolism and ongoing pressure sores, were symptomatic of the neurodegenerative disease.[6] Sadly, Dr. Young explained that "[t]here are no cures" for these neurodegenerative diseases and that by the time defendant saw Letasha, "she was already a very advanced case of neurodegenerative decompensation." Dr. Young thus opined that "[defendant] was not responsible for the terrible, unfortunate progressive neurodegenerative disease that she suffered from."

¶ 23　　To the extent plaintiff claimed that Letasha's herpes outbreak and the pregnancy tests ordered by defendant for her were a sign of sexual abuse, this was belied by Letasha's own medical records that showed she was diagnosed with herpes before defendant took over her care (see *supra* ¶ 20) and that she was given pregnancy tests on a regular basis at almost every nursing home. Moreover, defendant presented Dr. Rachel Oosterbaan as an expert witness specializing in internal medicine. Dr. Oosterbaan testified that an immunocompromised person with herpes, like Letasha, is more susceptible to herpes outbreaks. Dr. Oosterbaan further testified that pregnancy tests are routinely given as a precautionary measure to nursing home patients, like Letasha, who are frequently on antibiotics.

¶ 24　　Even the testimony from plaintiff's own expert witnesses refuted her claim that Letasha was abused and neglected due to defendant's treatment of her. On cross-examination, Dr. John Russo, an internal medicine expert, conceded that Letasha's unexplained weight loss was characteristic of a neurodegenerative disease, rather than a sign of abuse in this case. Moreover, Dr. Russo's opinion that Letasha's herpes outbreak indicated sexual abuse was unsubstantiated, as his prior deposition testimony established that he never specifically reviewed her relevant wound care records from Alden.

¶ 25　　On cross-examination, Dr. Victoria Braund, a geriatrician expert, conceded that Letasha's herpes, which is a lifelong disease, could "flare up at any point." To that end, plaintiff's own testimony indicated that Letasha's herpes outbreak was not caused by defendant but by an

---

[5]Plaintiff cancelled Letasha's dentist appointment because she was unavailable that day, but defendant successfully rescheduled it.

[6]At oral argument before this court, plaintiff's counsel incorrectly claimed that Dr. Young only testified about Letasha's cause of the death when he testified as to the cause of her pain and suffering from the neurodegenerative disease, as shown above (see *supra* ¶ 22).

exposure to feces from Letasha's constant attempts to remove her diaper. Dr. Braund also conceded that Letasha's falls, which are common amongst nursing home patients, were not a sign of abuse because they were well-documented by Alden's nursing staff.

¶ 26 We note, however, that the jury in this case was presented with some conflicting testimony, over defendant's objection, that defendant made concerning Letasha's alleged abuse throughout the course of these proceedings, including at his deposition, the first trial, and here. Defendant's prior testimony indicated that, at some point, he believed Letasha was abused at Alden but never reported it because he feared retaliation from the nursing home. In contrast, defendant testified here that he never suspected Letasha was abused.

¶ 27 By January 2014, Letasha was barely eating. Defendant recommended a feeding tube for her but plaintiff, as her power of attorney for healthcare, did not consent to it. Around the same time, defendant was notified by Letasha's wound care nurse at Alden, Manny Young, that she had developed an unstageable sacral pressure sore and had a 102.2-degree fever. Even though defendant had successfully treated Letasha's pressure sores in the past, nothing, including a week of intravenous antibiotics, had any effect on her aggressive sore or her fever. Consequently, defendant recommended that she be transferred to a hospital for treatment.

¶ 28 E. Letasha Is No Longer Under Defendant's Care

¶ 29 In February 2014, Letasha was transferred to Mercy Hospital (Mercy). During the next few months, Letasha developed 34 new pressure sores. She also suffered from chronic urinary tract infections, ultimately leading to an acute systemic infection. Letasha died on August 22, 2014. The immediate cause of Letasha's death was sepsis, but expert witness testimony from both parties suggested that the ultimate cause of her death was the incurable, fatal neurodegenerative disease.

¶ 30 F. Verdict

¶ 31 The jury in this case was instructed on sole proximate cause. As such, if the jury decided that the sole proximate cause of Letasha's injuries was "someone else other than the conduct of *** defendant" or "*something* other than the conduct of the defendant" (emphasis added), it was instructed that the "verdict should be for *** defendant." In other words, if the jury found that Letasha's injuries were solely caused either by one of the nursing homes or hospitals (or another actor) that was occupying an "empty chair" in this case, or by her neurodegenerative disease, then defendant was not liable.

¶ 32 We note the record reveals that plaintiff received a settlement in excess of $900,000 from Alden. Although defendant did not specifically point to the conduct of Alden or another "empty chair" occupant that was involved in Letasha's care as being the sole proximate cause of her injuries, there was a great deal of testimony about the progressive, incurable, fatal neurodegenerative disease that she was suffering from.

¶ 33 Ultimately, the jury returned a general verdict in favor of defendant. Since the parties did not request any special interrogatories, however, we do not know on what theory the jury found him not liable.

¶ 34                                    G. Posttrial Motion

¶ 35      Plaintiff subsequently filed a posttrial motion, requesting a judgment notwithstanding the jury's verdict and a new trial. Following arguments from both parties, the trial judge offered his own opinion that there was a deviation from the standard of care in this case based on defendant's failure to report any suspected abuse or neglect of Letasha. The trial judge, however, acknowledged, "[t]he standard is not whether I agree with the verdict," nor is it "my role *** to weigh the credibility of the witnesses." Rather, "it is jurors' function to weigh the credibility of the witnesses." In concluding that the jury's verdict was not against the manifest weight of the evidence, the trial judge noted that the jury was presented with plenty of evidence from both parties and that the case was "very well tried *** by both sides."

¶ 36      The trial court denied plaintiff's posttrial motion on May 22, 2019, and plaintiff appealed.

¶ 37                                       II. ANALYSIS

¶ 38      As stated, plaintiff contends that the trial court erred in denying her request for a new trial because the jury's verdict for defendant was not based on the evidence, which, she claims, overwhelmingly showed that Letasha was abused and neglected at Alden while she was under defendant's care. Plaintiff's claim is somewhat unclear, but she seems to suggest that defendant's failure to report the alleged abuse committed by Alden's staff at the nursing home constituted negligent treatment of Letasha by him that caused her pain and suffering.

¶ 39      A motion for a new trial should not be granted unless the jury's verdict is against the manifest weight of the evidence, *i.e.*, only when the opposite conclusion is clearly evident or the jury's findings are unreasonable, arbitrary, and not based on any of the evidence. *Steed v. Rezin Orthopedics & Sports Medicine, S.C.*, 2021 IL 125150, ¶ 44; *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). As the reviewing court, we will not disturb a trial court's ruling on a motion for a new trial absent an abuse of discretion. *Steed*, 2021 IL 125150, ¶ 44. An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful or unreasonable, or when no reasonable person would adopt the same view. *Cimino v. Sublette*, 2015 IL App (1st) 133373, ¶ 102.

¶ 40      In reviewing the trial court's ruling on a motion for a new trial, we are mindful that the trial judge had "the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility." (Internal quotation marks omitted.) *Maple*, 151 Ill. 2d at 456. Thus, we will not substitute our own judgment for that of the trial court or the jury by reweighing the evidence. *Id.*

¶ 41      Having carefully reviewed the evidence adduced at trial, we cannot conclude that the jury's verdict for defendant was unreasonable, arbitrary, or not based on any of that evidence. To prevail on her negligence claim, plaintiff here was required to prove that defendant owed a duty to Letasha, that defendant breached that duty, and that the breach was the proximate cause of Letasha's injuries. See *Steed*, 2021 IL 125150, ¶ 36. Based on the general verdict rendered by the jury in the case, plaintiff, at minimum, failed to show that defendant's treatment of Letasha proximately caused her injuries or her alleged pain and suffering.

¶ 42      As set forth above, the jury was presented with extensive evidence of Letasha's medical history and her tragic diagnosis. Expert testimony from both parties established that Letasha was suffering from a progressive, incurable, fatal neurodegenerative disease. It also established

that Letasha was already in an advanced stage of that disease when defendant began treating her.

¶ 43   Although the jury was presented with conflicting fragments of defendant's past testimony, it was also presented with conflicting live testimony from plaintiff's expert witnesses. For example, Dr. Russo, who incidentally was twice impeached, concluded that Letasha's herpes outbreak indicated that she was abused at Alden, even though he stated earlier that he never specifically reviewed her relevant wound care records. Likewise, Letasha's medical records, indicating that she was given pregnancy tests on a routine basis, contradicted Dr. Braund's initial testimony that the pregnancy tests ordered by defendant were a sign of sexual abuse. The evidence before the jury thus presented credibility issues for both parties. The jury, having weighed that evidence, ultimately agreed with Dr. Young that "[defendant] was not responsible for the terrible, unfortunate progressive neurodegenerative disease that [Letasha] suffered from," and the evidence at trial supported that conclusion.

¶ 44   Even if the jury determined that defendant breached his duty to Letasha, it could have reasonably found that plaintiff had failed to prove that the breach proximately caused Letasha's injuries. Unlike the traditional eggshell plaintiff who suffers unforeseeable injuries from a preexisting condition, Letasha suffered most likely inevitable injuries symptomatic of her neurodegenerative disease that plaintiff failed to prove were proximately caused by defendant. But *cf. Colonial Inn Motor Lodge, Inc. v. Gay*, 288 Ill. App. 3d 32, 45 (1997) ("If the defendant's conduct is a substantial factor in bringing about the injury, it is not necessary that the extent of the harm or the exact manner in which it occurred could reasonably have been foreseen.").

¶ 45   Based on the foregoing, the jury in this case could have reasonably found that Letasha's injuries were solely caused by her progressive, incurable, fatal neurodegenerative disease. On the other hand, the jury could have reasonably found that Letasha's injuries were solely caused by Alden through its nursing staff or by another one of the five nursing homes or hospitals involved in her care that was occupying an "empty chair." See *McDonnell v. McPartlin*, 192 Ill. 2d 505, 516 (2000) (noting that a defendant may "defeat a plaintiff's claim of negligence by establishing proximate cause solely in the act of another not a party to the suit"). Because the jury in this case returned a general verdict, however, there is no way of knowing on what theory the jury found in favor of defendant. See, *e.g.*, *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 492 (2002).

¶ 46   We note that, at oral argument before this court, plaintiff's counsel attempted to obtain a new trial solely on the theory that defendant failed to ensure that Letasha's wound care dressings contained a petroleum-based barrier, which would have somehow prevented the alleged pain and suffering that she experienced while lying in her own urine and feces. But since plaintiff failed to request a special interrogatory on this singular issue, we cannot set aside the jury's general verdict based on that contention. "When there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the [plaintiff], having failed to request special interrogatories, cannot complain." (Internal quotation marks omitted.) *Id.*

¶ 47   In sum, plaintiff did not meet her burden of showing that there was conclusive evidence before the jury that Letasha's injuries or pain and suffering, if any, were caused by defendant's treatment of her to warrant a third trial. Therefore, we must conclude that the jury's verdict for defendant was not against the manifest weight of the evidence. Accordingly, the trial court

properly denied plaintiff's request for a new trial in this case.

¶ 48                                III. CONCLUSION
¶ 49            For the reasons set forth above, the judgment of the trial court is affirmed.

¶ 50            Affirmed.